Filed 6/22/15

# IN THE SUPREME COURT OF CALIFORNIA

In re DAVID ESCO WELCH          )
                               )          S107782
          on Habeas Corpus.     )
_____)

David Esco Welch filed an original habeas corpus petition in this court claiming he should be granted relief from his multiple murder convictions and death sentence.  We issued an order to show cause with respect to two of Welch's claims:  (1) that prejudicial juror misconduct occurred when jurors were exposed to improper communications by the bailiff or bailiffs, and (2) that trial counsel rendered ineffective assistance by failing to investigate and introduce evidence that Welch suffered from serious child abuse.

After an evidentiary hearing, the referee concluded (1) that there was no credible evidence of improper communications from the bailiffs to the jury and (2) that trial counsel performed deficiently at the penalty phase of Welch's trial by failing to investigate and introduce testimony from family members that Welch suffered from serious child abuse.

As to the first issue, we agree with the referee's conclusion that there was no credible evidence of juror misconduct.  As to the second issue, we conclude that in light of the strong aggravating evidence against Welch, as well as the mitigating evidence introduced at trial, the additional mitigating evidence that trial counsel could have introduced would not have bolstered Welch's mental illness defense to such an extent as to undermine confidence in the penalty verdict.  Nor

would it have likely resulted in a successful alternative defense based on sympathy for Welch as the victim of child abuse.  We therefore hold that Welch is not entitled to relief.

## I. PROCEDURAL BACKGROUND

In June 1989, a jury found Welch guilty of six counts of first degree murder in a single incident occurring on December 8, 1986.  It also found him guilty of two counts of attempted murder in connection with the same incident and one count of concealing a firearm as a felon.  The jury found true a multiple-murder special-circumstance allegation.  (Pen. Code, § 190.2, subd. (a)(3).)  At the penalty phase, the jury returned a death verdict, and the trial court sentenced him to death.  We affirmed this judgment in 1999.  (*People v. Welch* (1999) 20 Cal.4th 701 (*Welch*).)

Welch filed his first habeas corpus petition in June 2002.  In claim 6 of the petition, he alleged juror misconduct.  He produced juror declarations alleging, among other things, that the bailiffs improperly communicated to the jurors that Welch or his confederates were threatening witnesses at trial.  His petition also alleged, in claim 18, ineffective assistance of counsel at the penalty phase for failure to introduce mitigating evidence that Welch suffered physical abuse and deprivation as a child.  This claim was supported by a declaration from his maternal aunt, Sarah Perine.   Perine declared that Welch's father was unable and unwilling to provide for his family and as a result Welch often went hungry.  According to Perine, Welch's father, also named David, was a violent alcoholic who abused Welch's mother and beat her frequently, including when she was pregnant with Welch.  Welch's father also frequently beat Welch "with belts, extension cords, or anything he got his hands on."  Perine further stated that no one had ever contacted her about Welch's case until June 2002 and that she would have been available to testify at trial had she been contacted.

2

In November 2005, we issued to the Director of the Department of Corrections (now Director of the Department of Corrections and Rehabilitation) an order to show cause why we should not grant Welch relief on grounds of jury misconduct and ineffective assistance of counsel as alleged in claims 6 and 18 of his habeas corpus petition. After the Attorney General's return and Welch's reply, we ordered a reference hearing in May 2007. In that order, we granted Welch's request that the hearing be held in Contra Costa County, rather than in Alameda County where the crimes occurred. The order directed the referee to address three sets of questions:

1. During Welch's trial, did the bailiff engage in improper communications with any of the jurors that exposed them to information prejudicial to Welch? If so, what were those communications?

2. Did trial counsel adequately investigate potential evidence in mitigation during the penalty phase that Welch had been the victim of serious child abuse? If trial counsel's investigation was inadequate, what additional information would an adequate investigation have disclosed?

3. If an adequate investigation would have yielded evidence that Welch suffered serious child abuse, would a reasonably competent attorney have introduced such evidence at the penalty phase of the trial? What rebuttal evidence reasonably would have been available to the prosecution?

In June 2007, Contra Costa County Superior Court Judge Mary Ann O'Malley was appointed referee. The referee conducted an evidentiary hearing from September 13, 2010 through April 11, 2011, during which some 30 witnesses testified. The referee filed a thorough 64-page report with recommendations in this court on January 2, 2013. Welch and the Attorney General filed exceptions to that report on September 3, 2013 and replies on October 4, 2013.

3

## II.  TRIAL EVIDENCE

One of the primary issues in this case is whether trial counsel's failure to introduce evidence of child abuse and neglect suffered by Welch was prejudicial at the penalty phase.  Deciding this issue requires an examination of the evidentiary record as a whole.  Accordingly, we include here the summation of the trial evidence from our opinion affirming Welch's death judgment on direct appeal.

**"A.  The Prosecution's Case**

"In the morning hours of December 8, 1986, Welch and his girlfriend at the time, Rita Lewis, broke down the front door of Barbara Mabrey's home in Oakland, and killed six persons as they were sleeping in various rooms.  Among the dead were Dellane Mabrey, the 16-year-old daughter of Barbara Mabrey and former lover of defendant, Sean and Darnell Mabrey, Barbara Mabrey's 21-year-old and 22-year-old sons, Catherine Walker and her 4-year-old son, Dwayne Miller, and Valencia Morgan, Dellane Mabrey and Leslie Morgan's 2-year-old daughter.  Four people survived the attack:  Barbara Mabrey escaped through the back door; her son Stacey Mabrey avoided detection by hiding in a bedroom closet; Leslie Morgan, though shot in the arm, feigned death and later escaped through the back door; and Dexter Mabrey, a nine-month-old child, was only grazed by one of the bullets that killed his mother and sister.

"Dellane and Valencia had been shot in the head at close range.  Sean had been shot in the chest and head while sleeping on the living room couch.  His wounds were fatal, puncturing the aorta.  Darnell Mabrey had also been fatally shot in the head while sleeping.  Catherine Walker and Dwayne Miller had been shot while sleeping on the sofa in the den.  They, too, had both been shot in the head at close range while asleep.

"Defendant and the Mabreys had serious difficulties with each other in the few months before the shooting. Barbara Mabrey had met defendant in early 1986. Her daughter, Dellane, was dating defendant and said that defendant was Dexter's father. Around September 1986 Barbara and defendant had an argument over Dellane, with Barbara telling him to stay away. On October 9, 1986, shortly after Dexter was born, defendant broke into the house and at gunpoint took Dexter away from Barbara. Dellane and her daughter Valencia went with defendant and were gone for three days.

"A few days later, when Barbara was going to the store, defendant drove up to her and spat at her from the car window, yelling 'Bitch, you are dead.' He followed her home, striking her in the knee with his car as she tried to flee into her home and laughing as he did it. A day later he told one of Barbara's friends to stay out of his business and to tell Barbara that she is a 'dead bitch.' On October 20, 1986, he confronted her again at a neighborhood market, throwing a liquid into her face. After cursing at her, he knocked her down and kicked her several times as she was on the ground. He escaped from the police on his motorcycle.

"On October 29, 1986, defendant entered the Mabrey house about 3:00 a.m. with a friend named Kenny and confronted Leslie Morgan and Dellane, slapping the latter in the face. He pointed the pistol at Barbara, telling her not to get near him and saying that she 'better not go to court and testify against him or his people' or else they were going to 'take care of' her, and that she would be killed slowly, shooting her arms off first and then her legs. He also ordered Leslie Morgan to leave, forcing him to flee in his underwear. He pointed a .45-caliber pistol towards the floor as he left Dellane's room. He told Darnell Mabrey 'don't do anything' as he pointed the gun in Darnell's direction. He left the residence.

5

"Defendant was arrested for the October 29th incident, and wrote Barbara a letter from jail requesting that she drop the charges. He was eventually released on bail.

"While at home with Dellane, Darnell, Sean, Stacey, Valencia and Dexter, Barbara received a visit from defendant on December 6, 1986, who apologized to her, although Barbara did not accept the apology. He came over with his two pit bull puppies, which had been placed in the yard, and, when he discovered one of them to be missing, angrily began accusing Darnell, Sean and Steve Early (who was also at the house) of taking the puppy. Denying he had taken the dog, Early left in his car with defendant close behind. As defendant left he told those present they had better find his dog or they would all be dead. Defendant then shot through Early's back window, all the while saying, 'you stole my dogs, you motherfucker.' He also said, as he was leaving, that they had better find his dog or they would all be dead.

"Early the next day, on December 7, 1986, defendant and Rita Lewis went to the Mabrey house, asking Barbara not to testify against him in court, where she was scheduled to appear on December 9. He also talked about Barbara's involvement in taking his dogs. Later that evening, Stacey's car was hit by a car driven by Vanessa Walker. A car with defendant, Dolores Walker, and two men, 'Billy the Kid' and William Henderson, drove up to the scene. Defendant got out of the car with a pistol in his hand and pistol-whipped Stacey's friend Perry. He kicked Dolores out of the car, saying something about a dog. Barbara heard him say that 'you Stone City niggers' — referring to the Stonehurst area of Oakland — 'better get my dog or somebody's going to die.' Later he told Dolores Walker that 'its [*sic*] going to be some bullshit tonight.'

6

"In the early morning hours of December 8, 1986, defendant returned to the Mabrey house. Stacey, Barbara and Leslie Morgan all identified defendant as the shooter that morning. They all identified Lewis as his accomplice.

"According to this testimony, defendant was carrying an Uzi carbine in his hand and Lewis was holding a .38-caliber revolver. Stacey Mabrey went to his room and hid near the closet as defendant looked past him in the room and asked, "where's Chuck," Stacey's younger brother, who normally slept in the room. Stacey heard several more shots. Urged by Lewis to leave, defendant left the house, limping and holding on to Lewis and another person who helped him into a car.

"Barbara also woke up to gunshots and heard Dellane screaming, 'no, Moochie, don't.' ['Moochie' was defendant's nickname.] She saw Lewis pointing a gun and telling defendant to get out of the way. Lewis had a pistol in her hands and Barbara heard more gunfire before she escaped out of the house by the rear.

"Leslie Morgan testified that defendant stood at close range as he shot Dellane, saying, 'this is for you, bitch.' He also shot Valencia in the head. Leslie grabbed him and struggled with him, knocking his Uzi to the ground. Rita Lewis shot Leslie in the shoulder as they struggled. After defendant found his gun, he shot Leslie twice more in the arm and Leslie played dead. Leslie did, however, see defendant straddle Dellane's body and heard another gunshot.

"Defendant and Lewis went to Beverly Jermany's residence at 2116 103d Avenue in Oakland shortly after the murders, about 5:00 a.m. Defendant, who was a second cousin of Jermany's, was lying on the porch and could not walk. He was in pain and only semiconscious. Lewis told Jermany that she had accidentally shot him. She was carrying a pillowcase. Jermany asked Lewis whether it contained drugs and she said it did not. She took the pillowcase outside and did

7

not return with it. Jermany eventually notified the police that defendant was at her house, and he and Lewis were apprehended.

"The murder weapons were found in a pillowcase in the backyard of Jermany's house. There was an Uzi, a Smith and Wesson .357 handgun and a .38-caliber Taurus revolver. The Uzi had a twenty-five-round capacity and was loaded with one round in the chamber and four rounds in the magazine. The .357 handgun was loaded and contained three live rounds and three spent rounds. The .38-caliber revolver was loaded with two live rounds and four expended cartridges. One slug recovered at the murder scene was fired from a Smith and Wesson .357. Other bullet fragments could have been fired by either a Smith and Wesson or a Taurus.

"Burned clothing was recovered from the fireplace. Blood found on tennis shoes recovered from 2116 103d Avenue matched Leslie Morgan's blood. One of the tennis shoes could have made a shoe print found on Barbara Mabrey's front door.

**"B. The Defense**

"The defense was characterized by differing strategies by trial counsel and by defendant. Defendant was the first witness for the defense. Taking the stand without a recess, and over defense counsel's protest that he wanted time to speak with him to find out what questions to ask, defendant testified generally that he did not commit the murders. He declined to answer questions about who had shot him, and testified that he was shot in the leg between midnight and 5:00 a.m. in an incident at Scotty's liquor store, rather than at Barbara Mabrey's home. Defendant claimed that he had nothing to do with the shooting at the house the morning of December 8, 1986, and never threatened any of the Mabreys. He had gone to his cousin's house after being wounded because he believed there might be warrants

8

for his arrest related to other matters. He also testified that he was a victim of mistaken identity, and that it must have been some other 'Moochie' who had committed the murders.

"The thrust of the defense presented by trial counsel, on the other hand, was that defendant's mental impairment from drug and alcohol intoxication at the time he committed the murders was such that he lacked the premeditation and deliberation necessary for a first degree murder conviction. A urine screen and qualitative blood analysis had been performed on blood drawn from defendant on December 8, 1986. Defendant had alcohol in his blood, and cocaine and morphine, a metabolite of heroin, in his urine. A quantitative analysis was never performed, so the exact amounts of alcohol, heroin, and cocaine defendant had consumed could not be estimated. Dr. Paul Herrmann explained the effects that these substances can generally have on the central nervous system. Alcohol and heroin, both depressants, and cocaine, a stimulant, whether consumed separately or in combination, can have a deleterious effect on motor skills and mental functioning, even at very low levels. Testimony to the same effect was provided by Dr. Fred Rosenthal, who also listed sleep deprivation as an additional factor affecting coherent thought processing. Trial counsel also presented a number of witnesses acquainted with defendant for the apparent purpose of demonstrating that he tended to act impulsively.

"**C. Penalty Phase**

"*1. Prosecution Evidence in Aggravation*

"The prosecution introduced evidence that defendant had been convicted of three prior felonies: assault with a deadly weapon, in violation of section 245, subdivision (a), on May 8, 1981; receiving stolen property, in violation of section

473, on August 5, 1981; and assault on a police officer in violation of section 243, subdivision (c), on April 7, 1983.

"Evidence of a number of instances of uncharged violent conduct was also introduced. While in juvenile hall in October 1973, defendant hit a counselor and spit on him as he was trying to run away from the facility. He had just been brought down for disciplinary problems from one of the camps to a more secure facility.

"Defendant, when he was a juvenile, discharged a shotgun into Faye McPherson's residence on December 26, 1975. The McPhersons had been his neighbors for 11 years and had not previously had any problems with him. The blast damaged the walls above her child's crib.

"On March 20, 1979, defendant was involved in a high-speed chase with several San Francisco police officers. When the police finally stopped his motorcycle, he got off and a struggle ensued, with defendant punching and kicking the officers. He hit one of the officers with clenched fists and kicked him as well. He also tried to run over another officer with his motorcycle, getting within three to five feet before the officer jumped out of the way.

"On December 20, 1979, defendant assaulted Oakland Police Officer Rosemary Dixon while she was working at the warrant division at the station house; she suffered serious injuries as a result of the assault.

"Defendant raped and sodomized Jaunell T., a former lover, on May 21, 1980.

"On January 22, 1985, while in maximum security custody, defendant got into a fight with another inmate. He did not stop fighting when ordered and eventually had to be subdued with Mace.

"On July 12, 1985, he fought with another inmate while they were being transported to jail from court.

10

"On December 16, 1987, while in custody for this case, defendant refused to go to court and started swinging at one of the correctional officers. He gave Deputy Charles Utvick a glancing blow to the side of the head. He made a statement to Deputy Mark Johnson that he was going to kill him or have him killed, and that he would have the rest of the deputies taken care of as well.

"Several instances of violent behavior while defendant was incarcerated at state prison were introduced. On December 9, 1981, while in a visiting room, he grabbed his wife, Terry West, by the neck and threw her against the wall. On February 19, 1982, defendant struck a correctional officer in the jaw. On June 24, 1982, he spit on Correctional Captain Steven D. Lawrence several times after Lawrence meted out a 30-day loss of privilege following a disciplinary hearing. Shortly thereafter when he got back to his cell from the disciplinary hearing he threw some fecal matter at Correctional Officer Roy Wade Gowin, hitting Gowin in the face. He then started hitting Gowin and another officer, swinging the handcuffs during the struggle. Gowin was struck twice by the handcuffs during the struggle and required medical treatment for the cuts on his forehead and eyebrow. Defendant also bit him.

"On September 25, 1982, while in jail, defendant struck a deputy sheriff in the face with a closed fist. After the deputy sprayed defendant in the face with Mace, defendant hit the deputy again in the face with his fists. The deputy suffered lacerations of his chin and left eye and several cracked ribs, and lost time from work for about two weeks.

"*2. Defense Mitigation Evidence*

"Defendant told the trial court that he did not want to put on any mitigating evidence. Over his protest, trial counsel indicated that he had, and would put on, two mitigation witnesses to show that defendant was under the influence of

11

extreme mental or emotional disturbance at the time of the murders and that he lacked the ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as a result of mental disease or defect, or the effects of intoxication.  Dr. William D. Pierce, a clinical psychologist, and Samuel Benson, Jr., a psychiatrist, testified in mitigation.  Defendant did not.

"Dr. Pierce reviewed defendant's school records, juvenile court records, adult criminal history records, and records relating to the murders.  He opined that defendant was mentally ill and had been so for a long time, suffering from delusional paranoid disorder, psychoactive substance abuse disorder, paranoid schizophrenia, impulsive personality disorder, and an organic personality syndrome of an explosive type.  His delusional paranoid disorder was of a persecutory type.  His mental problems started as early as kindergarten, and were characterized by uncontrolled behavior.  Defendant never received any treatment for his disorders, either in or outside of custody.  His behavior was characterized by mistrust, paranoia, and the inability to control aggressive acting out.  Alcohol, cocaine and heroin abuse intensified these effects, further reducing his ability to control his impulses and behavior.  His condition was chronic.

"Dr. Benson similarly opined that defendant was suffering from a mental defect and from a mental illness at the time of the commission of the murders.  His basic problems, which included an intermittent explosive personality disorder, organic personality disorder, persecutory delusional disorder, and cocaine-induced delirium, were aggravated by intoxication.  Defendant was paranoid and delusional in the courtroom, and perceived 'the Judge, the district attorney, his attorneys, [and] Dr. Pierce . . . as being against him.' " (*Welch*, *supra*, 20 Cal.4th at pp. 722–728, fn. omitted.)

12

### III. JURY MISCONDUCT

We first consider Welch's claim that improper contacts between jurors and one or more bailiffs gave rise to prejudicial jury misconduct. We conclude, as did the referee, that there is no credible evidence of any such misconduct.

We have recognized that "a nonjuror's tampering contact or communication with a sitting juror[] usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 295.) If we find misconduct, we proceed to determine whether that misconduct was prejudicial to defendant. We have identified two tests for prejudice, and "[t]he judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) First, we ask whether the external communication is so inherently prejudicial that it is substantially likely to have biased the juror. This "inherently prejudicial" standard is objective and is satisfied when "the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment." (*Ibid.*) If we find no inherent prejudice, then we apply the " 'circumstantial' test" for prejudice, recognizing that "the totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose." (*Id.* at p. 654.)

Welch alleges two types of improper bailiff communications: (1) the bailiffs told jurors that Welch had urinated in the stairwell, and (2) the bailiffs communicated to jurors that Welch or his confederates had threatened witnesses.

### A. Urine in the Stairwell

During Welch's trial, bailiffs escorted jurors down a stairwell from the jury room on the seventh floor to the courtroom one floor below. Inmates, including Welch, were escorted through the same stairwell. Several jurors and the primary

13

bailiff, Deputy Dimsdale, recalled seeing or smelling urine in the stairwell during Welch's trial.

The referee found that Deputy Dimsdale believed Welch had urinated in the stairwell and reported his concern to the judge, but not the jury. The trial record reveals that the judge asked Welch, outside the presence of the jury, to control his bladder problems because "the bailiff" was concerned about him urinating in the stairwell. However, the referee found no credible evidence that Deputy Dimsdale communicated to jurors that Welch was the source of the urine. Deputy Dimsdale testified that he remembered frequently seeing urine in the stairwell during Welch's trial, that jurors mentioned the urine, but that he never brought urine to the jurors' attention.

Several jurors remembered urine in the stairwell. Juror J.G., a witness the referee found mostly credible, remembered being warned to avoid stepping in urine in the stairwell but did not recall who had given the warning. Two other jurors, B.W. and J.C., remembered a bailiff commenting about the urine, but the referee found neither juror credible. B.W. remembered smelling urine in the stairwell and recalled the bailiff saying the urine must have come from an inmate. The referee gave B.W.'s testimony "very little weight" due to his "clear bias," noting that B.W. had testified that he had compassion for Welch and that his memory was affected by open-heart surgery. J.C. testified that someone, perhaps a bailiff, told jurors there was urine in the stairwell and recalled someone saying Welch was the source. J.C. could not remember who made either statement, but believed the purpose might have been to detract from Welch's competency. The referee found J.C.'s testimony not credible, reasoning that no other juror corroborated his testimony and that J.C. was confused, equivocal, and easily led while testifying. Overall, the referee found no credible evidence that any bailiff had communicated to jurors that Welch had urinated in the stairwell.

Welch contends that "[d]iscussions regarding urine in the stairwell clearly took place in the escorting bailiff's presence." Even if true, however, such discussions did not necessarily constitute improper communication by the bailiff or misconduct by the jurors. Deputy Dimsdale acknowledged that jurors mentioned the urine but testified that he did not bring it to their attention, and the referee found his testimony credible. Nor does the fact that that Deputy Dimsdale believed Welch urinated in the stairwell and brought it to the judge's attention substantiate the claim that he also communicated this belief to jurors. "[W]e generally defer to the referee's factual findings and 'give great weight' to them when supported by substantial evidence." (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333.) Here we have no reason to question the referee's determination that Deputy Dimsdale did not engage in improper communications with jurors.

## B. Witness Threats

Three jurors recalled some variation of a discussion among jurors during trial that witnesses felt threatened by Welch or his supporters. However, the referee found "no evidence that the bailiff was the source of any information about threats." To the extent that jurors held such beliefs, the referee attributed the beliefs to information obtained through legitimate means. Jurors heard Barbara Mabrey testify at trial that Welch had threatened her in an attempt to dissuade her from testifying against him regarding an earlier assault. Additionally, the prosecutor, James Anderson, spoke to jurors about safety concerns after the case's completion. The referee reasoned that Barbara Mabrey's testimony, coupled with the posttrial conversation with the prosecutor, explained the jurors' memories concerning witness threats.

Welch takes exception to the referee's finding that no bailiff communicated that Welch threatened witnesses, but he does not provide evidence to the contrary. He points to Juror J.C., who testified that all of the jurors participated in

15

conversations regarding "whether or not petitioner was capable of threatening the jurors because evidence at trial indicated he had actually made threats against witnesses." But this testimony is not inconsistent with the referee's determination that the jurors perceived witness threats based on Barbara Mabrey's testimony and the prosecutor's posttrial statements. Moreover, as Welch concedes, J.C. could not remember the source of the information regarding witness threats.

### C. Welch's Other Proposed Findings

Welch also contends that "jurors had an unusually close relationship with the bailiffs, particularly Deputy Dimsdale, who was assigned to petitioner's trial court." He claims, for example, that testimony at the evidentiary hearing (on which the referee did not make findings) suggests bailiffs drove jurors to shopping and lunchtime excursions and that jurors gave Deputy Dimsdale a card and $75 bond to celebrate his daughter's birth. This evidence, he claims, "tend[s] to corroborate petitioner's contention that bailiffs communicated the improper information that petitioner urinated in the stairwell and that witnesses had been threatened by petitioner and/or his supporters." This argument raises no new claim of misconduct. The fact that the referee made no findings on these associations between the bailiff and the jury indicates the referee's view that these incidents were not pertinent to the jury misconduct claims, and we have no reason to suppose otherwise.

We therefore conclude that Welch's juror misconduct claim is without merit.

16

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE

### A. Referee's Findings

> 1. *Did trial counsel adequately investigate potential evidence in mitigation during the penalty phase that Welch had been the victim of serious child abuse?*

At the evidentiary hearing before the referee, one of Welch's trial attorneys, Alexander Selvin, testified at length. As the referee's report recounts: "The attorneys' penalty phase strategy was to urge the jury not to execute a mentally ill person. This proved difficult, because, as Mr. Selvin testified, Welch was impossible to work with. Mr. Selvin believed this was because, in Selvin's opinion, Welch was mentally ill. Welch, his parents, and some other relatives were totally uncooperative. The attorneys explained to family members that the legal team needed social history and background information from them, and set up at least four or five appointments for the family to come in. They never came. It became obvious to the attorneys after the family members failed to show up for the first two or three times that they would not cooperate. The attorneys even went to Welch's mother's home, to no avail. When the attorneys saw Mrs. Welch in court, they told her they'd like to speak to her; there was always some excuse why she could not meet with them. The attorneys felt that she clearly did not want to talk to them. Indeed, the attorneys felt Welch was in control of his family and that he did not want them to cooperate with the attorneys. The attorneys felt that the family was uncooperative, either because they were trying to be helpful to Welch or were afraid of him. Whatever the reason, the attorneys were unable to get any information from Welch, his family or anyone else."

Instead, trial counsel attempted to support the mental health defense by use of juvenile and adult probation reports obtained from the district attorney's office, as well as school records. The attorneys felt they had enough information from

the reports to support their mental illness mitigation defense. Dr. Pierce, the mental health expert, said he was satisfied there was enough to support that penalty phase argument. The referee found Selvin to be a credible witness.

The referee found that trial counsel's efforts were "adequate" with respect to contacting Welch's parents. The referee found that Welch's mother, Minnie Welch, would not have been available at Welch's trial, notwithstanding her testimony to the contrary at the reference hearing. The referee found her not credible on that point in light of the fact that she broke various appointments with trial counsel at the time. Welch contends that the referee erred in this regard. He argues that counsel's inability to meet with her was not dispositive and that given her age, lack of resources, and disadvantaged background, her failure to keep appointments at counsel's office should not have deterred counsel from pursuing her as a social history witness. But the referee was in a position to judge the credibility of Minnie Welch's testimony that she would have testified at trial, and substantial evidence supports the referee's conclusion that her testimony was not credible.

The referee nonetheless found that "the trial attorneys, in ending their efforts when stonewalled by Welch and his parents, conducted an inadequate penalty phase investigation. Competent counsel would have sought (either themselves or through an investigator) to obtain social history information from other sources about Welch's mental health, child abuse and social history." Specifically, the referee found that "the trial attorneys did not meet prevailing professional norms at the time of trial when they failed to contact and obtain social history information from Cathie Thomas (Welch's sister), Sarah Perine (Welch's maternal aunt) and Roy Millender (Welch's maternal uncle) — all of whom were available to testify at the time of Welch's trial."

18

The referee further found that "the penalty phase investigator, Ms. Lesmeister, failed to contact Welch's sibling, aunts and uncles. Welch's attorney, Mr. Selvin, knew or should have known about this hole in the investigation: He testified he was not aware of any work product produced by Ms. Lesmeister, and did not see any in the file. Nor was there evidence the trial attorneys themselves ever undertook to contact other family members. There were no interview reports with social history or mitigation witnesses contained in the trial attorneys' files. Trial counsel did not specify which 'family' members they attempted to contact other than that Mr. Selvin recalled setting up an appointment for 'someone else,' possibly Welch's brother or uncle. Mr. Selvin could not recall, however, anyone on the team performing or obtaining any social history interviews, any statements, affidavits, declarations, or witness statements.

"Mr. Selvin conceded that even if Welch was difficult, paranoid or uncooperative it was still the attorneys' duty to conduct a mitigation investigation. Yet Welch's trial counsel decided that since they were not getting cooperation from Welch and his parents, to go with what they had, which was, essentially, the records. They thought they had enough there and if the jury did not believe Welch was mentally ill, nothing they could do would make a difference at the penalty phase once he had been convicted at the guilt phase. The Referee finds trial counsels' reasoning did not absolve them of their duty to adequately investigate evidence in mitigation at the penalty phase especially in light of the evidence that the trial attorneys were aware that they needed to talk to other family members."

The referee further found that "Welch's attorneys, in failing to seek social history information from members of Welch's community, did not conduct an adequate penalty phase investigation. Coworkers, teachers, classmates, neighbors or other professionals (such as probation officers) had encounters with Welch in

19

his developmental years and were available.  The attorneys should have directed their investigator to pursue these potential witnesses."

The Attorney General disputes the referee's finding that Welch's counsel performed deficiently in failing to interview Welch's sister Cathie Thomas, his aunt Sarah Perine, and his uncle Roy Millender.  The Attorney General argues that the only way to establish contact with Welch's extended family was through Welch or his parents, none of whom cooperated at trial.  "It took habeas counsel years to contact Sarah Perine and Roy Millender, even with the belated cooperation of Welch, his sister and his mother.  For that reason respondent excepts to the finding that counsel were ineffective in determining that the knowable or available family members would not cooperate in the development of penalty phase evidence."

In addressing this contention, we note that the referee came to somewhat inconsistent conclusions about Cathie Thomas's availability at trial, as discussed below.  But we have no reason to question the referee's findings that, with adequate investigation, counsel would have discovered social history information from Sarah Perine and Roy Millender.  After hearing and considering all the testimony, the referee did not find that it would have been difficult or impossible for counsel, at the time of trial, to learn the identities or whereabouts of Perine and Millender or to secure their cooperation, and nothing in the record impels us to make such a finding.

The Attorney General also objects to the referee's finding that counsel was deficient in failing to contact community members outside of Welch's family who knew Welch as a child.  But, as explained below, the referee concluded that competent counsel would not have introduced the testimony of either of the two nonfamily social history witnesses who testified at the evidentiary hearing,

20

Konolous Smith and Glen Riley.  Our focus, therefore, is on the family members who would have testified if counsel had contacted them at the time of trial.

>    2.  *If trial counsel's investigation was inadequate, what additional information would an adequate investigation have disclosed?*

The referee found that "had there been an adequate investigation, information about severe child abuse would have been disclosed at the time of the penalty phase from social history witnesses Sarah Perine (Welch's maternal aunt), Cathie Thomas (Welch's sister), Konolus Smith (Welch's childhood friend) and Roy Millender (Welch's maternal uncle)."

The referee found "that additional information from these witnesses would have disclosed that Welch's father inflicted serious physical abuse upon Welch as a child to the time he was 17 years of age" and that "the following facts would have been discovered and could have been introduced at the penalty phase at trial:

"Welch was born on March 21, 1958, a year before his younger brother, Dwight, who was born on March 1, 1959 and 1½ years after his sister, Cathie, who was born on October 1, 1956.  Welch was known as 'Moochie.'

"Sarah Perine saw Welch's father spanking him with a belt, extension cord or shoe, or flicking his finger on Welch's head about once a week until she moved to Los Angeles in 1961.  Sarah also saw Welch shake and tremble around his father.

"According to Cathie Thomas their father, David Sr., when he was drunk became angry, violent and abusive to her mother and Welch.  He would leave on Friday night and show up drunk on Sunday night.  From her bedroom she could hear her father punch her mother with his fists.  When she would enter the room she saw her father hitting her mother.

"Cathie Thomas also heard her father hit Welch with a belt or extension cord in the boy's room.  This continued from the time Welch was six or seven to

21

age 17.  These beatings would last about five minutes, and she saw marks on her brother's arms from being hit.  Her father hit Welch more often when he was drunk, but also when he was sober; sometimes he would hit Welch for a reason, sometimes for no reason at all.

"The frequency of the physical abuse diminished when Welch was 12 or 13, once David Sr. began working in the merchant marines, and was home for only four to six weeks at six-month intervals.  When David Sr. was home, he would drink on the weekend and beat Welch.

"Welch's contact with his father further diminished after the age 12 or 13 when his parents divorced between 1970 and 1971.  Welch's father would still come back to their home on La Prenda, in Sobrante Park, off and on after the divorce.  He continued to hit Welch during this time.

"The last time David Sr. tried to hit Welch, Welch was 17.  For the first time, Welch fought back.  The confrontation spilled into the hallway and Welch and his father started to fight.  Immediately after the fight, Welch left the house with a shotgun and shot out the window of their car and the windows of the McPherson's house down the street.

"Konolus Smith, Welch's childhood friend, saw Welch's father hit Welch in public twice:  once when Welch was under the age of 10 and David Sr. arrived at school and gave Welch [a] 'kind of a slap upside the head'; and once when Welch was a teenager hanging out with his friends, and David Sr. came in and 'slapped him on the back of the head,' causing Welch to f[a]ll down 'for a couple of seconds' and appear 'stunned.'  However, there was no evidence of any head injuries suffered as a result or that Welch was knocked unconscious.  David Sr. also threw a bottle from a car while Welch was walking down the street.

"Roy Millender, Welch's maternal uncle, had seen Welch's father discipline Welch by hitting him and making him 'go to jail' in the closet.  Welch

22

also stayed with his uncle, on weekends and for as long as six weeks when school was out.  Welch stayed with his uncle off and on until he was 16 years of age."

> 3. *If an adequate investigation would have yielded evidence that Welch suffered serious child abuse, would a reasonably competent attorney have introduced such evidence at the penalty phase of the trial?*

The referee found that "faced with the prosecution's case in aggravation, a competent defense attorney would have presented some of the evidence that would have been revealed after adequate investigation of child abuse.  That evidence would help to mitigate the aggravating factors in the case as well as to engender sympathy for Welch."  Specifically, the referee found "that a reasonably competent attorney would have introduced the testimony of lay witnesses Cathie Thomas, Sarah Perine, and Roy Millender about the serious child abuse Welch suffered.  In particular, competent defense counsel would have introduced the following evidence:

"Cathie Thomas:

"She heard her father hit Welch with an extension cord when Welch was six or seven years old.

"The beatings would last about five minutes.

"She observed marks on Welch's arms.

"Her father hit Welch more often when he was drunk but also when he was sober.

"Sometimes her father would hit Welch for no reason at all.

"The beatings lasted until Welch was 17 years old, but with less frequency from age 12 through 17 when Welch's father worked for the Merchant Marines.

"Welch did not do well in school.

"As a small child Welch had a speech impediment.

"Welch was punished more severely than his younger brother Dwight.

23

"Sarah Perine:

"Welch's father was violent to Welch's mother.

"She saw Welch's father slap and beat Welch's mother when she was pregnant. On one occasion she saw Welch's father kick Welch's mother when she was on the couch.

"She saw Welch's father spank Welch with a belt, extension cord or shoe once a week.

"As a little boy, Welch would nervously shake when he was around his father.

"When he was a little boy Welch lived in poverty and was malnourished.

"Roy Millender:

"Welch's father would discipline Welch by hitting him and making him 'go to jail' (the closet).

"When Welch was a teenager and having problems at home Welch would stay with Mr. Millender for periods of up to six weeks; this occurred off and on until Welch reached the age of 16.

The referee found it unlikely that a competent defense attorney would have called Konolus Smith as a witness. "The three incidents he testified to did not amount to serious child abuse and his previous convictions of robbery and homicide would outweigh any value of his testimony. In addition, his testimony may have been more hurtful than helpful in that he testified that Welch picked fights all the time. If defense counsel called Mr. Smith, this adverse information would have to have been disclosed to the prosecution in discovery, and the prosecution would have used it against Welch in rebuttal." The referee also credited Selvin's testimony that he would not have called Glen Riley as a witness because of unfavorable information in a probation report.

24

The referee was somewhat inconsistent in her conclusions about the availability of Cathie Thomas at the time of trial. While including Thomas's testimony among the evidence that a competent attorney would have introduced at trial, the referee also stated that she was "not convinced Ms. Thomas would have cooperated any more than her mother did," notwithstanding Thomas's testimony at the reference hearing to the contrary. The reason for the referee's skepticism was that Thomas's testimony that she would have testified at trial "contradicts Mr. Selvin's testimony: although counsel did not testify that he had talked specifically to Mrs. Welch or Cathie Thomas during that visit, he was clear that no one from the family was cooperative." Welch points out that Selvin never affirmatively testified he had been to Welch's home and that there was no evidence Selvin's statement that "no one in the family was cooperative" specifically applied to Cathie Thomas.

The question whether Cathie Thomas would have testified at trial if contacted involves a determination of credibility. Substantial evidence supports the referee's finding that a competent attorney would have introduced Thomas's testimony. That evidence includes Thomas's testimony regarding her willingness to testify, her testimony that "[s]omeone came to the house" but "nobody ever talked to me," and the lack of any indication in Selvin's testimony that Thomas, in contrast to Minnie Welch, had been specifically contacted and refused to cooperate during trial. Nonetheless, the referee's conflicting findings on Thomas's availability undermines somewhat our confidence that competent counsel would have been able to discover and produce her testimony at trial.

The referee also considered how the evidence of child abuse and related testimony would have affected the mental illness evidence that was presented at trial. The two experts who had testified regarding Welch's mental impairments, Dr. Pierce and Dr. Benson, also testified at the reference hearing. The referee

25

found that the evidence of child abuse as well as other social history evidence would have significantly influenced Dr. Benson's testimony. "[E]ven without [additional] neurological testing data, had Dr. Benson been provided additional information about Welch's early childhood, Dr. Benson would have changed his diagnosis from organic brain disease (which at the time he vainly wished he could have tested to confirm) to traumatic brain disease. Dr. Benson at trial had already identified Welch's poor attention span, his poor judgment, his exaggerated response to confrontation and lack of control as evidence to support his diagnosis of traumatic brain disease. Many new facts would have solidified Dr. Benson's diagnosis: information that as a child Welch's appearance was sickly, he had trouble breathing, he had trouble keeping up in school, he had difficulties controlling his urine output, he lived a life of poverty, he was malnourished, and he was singled out for physical abuse by his father."

The referee further found that "Dr. Benson would also have provided additional expert opinion that Welch's sickliness and trouble breathing was consistent with brain damage and Welch's malnutrition could have led to a slower rate of development and growth. The referee finds that this new information would have also provided a factual basis for Dr. Benson's opinion that Welch's brain impairment was traceable to the abuse Welch suffered at the hand of his father.

"Dr. Benson testified at the reference hearing that only the terminology of his diagnosis would have changed had he known in 1989 what he now knows about Welch's social history. Nonetheless, his testimony would have been somewhat different. Dr. Benson's diagnosis would have been more certain and more grounded in fact. An expert's opinion is only as good as the facts upon which his or her opinion is based. More basis in fact may lend more credibility to

26

an expert's opinion. Here, the opinion Dr. Benson offered the jury would have been supported by additional facts testified to by the social history witnesses."

The referee further found that Dr. Pierce would not have changed his diagnosis of delusional paranoid disorder, persecutory type, and impulsive personality disorder, explosive type, which was based largely on Welch's courtroom behavior.

The referee also considered the opinions of three new experts who did not testify at trial: Dr. Karen Froming, Dr. Pablo Stewart, and Dr. Julie Kriegler. Dr. Froming, after conducting neurological testing on petitioner in 2002 and 2010, opined that "Welch has problems with attention, memory and working memory, tracking and manipulating information, and suppressing an over-learned response. He also cannot figure out what the rules are in the environment he is in. He will either perseverate on a response based on a misperception of the situation, or he can't fathom the situation at all, or he comes up with something idiosyncratic in response. Dr. Froming believes these results are consistent with impairments in the frontal and temporal regions of the brain."

The referee found that because Welch refused to submit to testing in 1989 with Dr. Pierce and Dr. Benson, "the additional diagnoses of Dr. Froming based on neurological and psychological testing would not have been available at the time of the penalty phase. [¶] . . . [¶] The fact that Welch later acquiesced to testing — over a decade later, and after the trial's results were known — does not retroactively change his behavior in 1989. He would not do it. Period." The referee therefore concluded that even if trial counsel had performed competently, Dr. Froming's testimony would not have been available at trial.

The referee also found no evidence supporting Dr. Froming's conclusion that the physical abuse suffered by Minnie Welch while pregnant with Welch raised the level of cortisol, a stress-activated hormone, in her bloodstream "or that

this was neuropsychologically toxic when and if it was transferred to Welch as a developing fetus." Welch takes exception to that finding, noting that a speech impediment and lack of coordination showed he was neurologically impaired from birth. But the referee, while not disputing the evidence that Welch had substantial neurological impairments from a young age and perhaps from birth, found no firm evidence that these impairments resulted from in utero exposure to his mother's stress hormones. We accept the referee's finding.

The referee also gave "very little weight" to the testimony of Dr. Pablo Stewart, a forensic psychiatrist. Although Dr. Stewart criticized the diagnoses of Dr. Benson and Dr. Pierce given at trial, his diagnosis did not significantly differ from theirs. Moreover, "his opinion is based on facts that were not proved at the hearing, such as the allegation that Welch suffered open wounds after being hit in the head by his father, and unfounded facts and an exaggeration of statements made in the declarations by friends and family." Welch takes exception to the referee's finding that Dr. Stewart's testimony had "questionable credibility," but we see no basis for challenging that finding. The referee concluded that Dr. Stewart's assessment of the effects of child abuse on Welch was based on numerous scars on Welch's face, forehead, and arms, but that Welch's frequent fights could also explain those scars. Although the referee did not go into detail as to why she found Dr. Stewart's testimony to be of questionable credibility, the referee was in a better position to determine his credibility, and we have no reason to question that determination.

For a similar reason, the referee discounted somewhat the testimony of Dr. Julie Kriegler, a clinical psychologist, who interviewed Welch and his family and reviewed records and declarations of Welch's family members and acquaintances. The referee found unproven some of the facts on which Dr. Kriegler based her opinion — in particular, that Welch suffered major head injuries as a result of his

28

father's abuse, that environmental toxins damaged Welch's nervous system, and that Welch was injured in utero due to blows to his mother's abdomen.

Nonetheless, the referee found that "competent counsel would have called a clinical psychologist like Dr. Kreigler to testify, based on the additional information from social history witnesses and clinical interview with Welch, to the following:

"Welch has a genetic risk for schizophrenia and substance dependency.

"Welch's father was dependent on alcohol and his father's mother was also known to be an alcoholic.

"Welch struggled in school and had a speech impediment which could be markers of neurological impairment.

"Welch had a history of substance abuse starting as early as age 10-12.

"Welch was psychologically impaired as a result of serious child abuse. He exhibited symptoms such as paranoia and a perception that people were out to get him.

"Welch is neurologically compromised. This is based on a constellation of symptoms exhibited by Welch as a child — his trouble breathing as an infant, behavioral and academic difficulties in school, lack of psychomotor coordination, his smaller size, and his speech impediment.

"As a result of protracted early trauma, Welch is severely neuropsychiatrically impaired. His function, his thought process, and his perceptions are also impaired. This is a result of a confluence of risk factors, the mental illness, the neuro-cognitive dysfunctions and protracted trauma. The risk factors include: his genetic risk for psychosis, mental illness and dysfunction, his substance dependence, the fact that his parents are of low educational status and came from poverty and that his father was raised in a severely abusive household and his father was abandoned by his mother."

"As a result of witnessing the abuse of his mother and being raised by compromised and dysfunctional parents, Welch suffered from dysregulation of his nervous system resulting in Welch's inability to control his impulses, to tolerate stress, delay gratification, make choices, self-soothe and stay calm.

"Welch exhibited symptoms of dysregulation such as lack of impulse control, reactivity, dissociative states, anxiety, paranoia, and obsessive compulsive behavior."

### 4. What Rebuttal Evidence Would Reasonably Have Been Available to the Prosecution?

The referee addressed the question of potential rebuttal evidence by focusing on the prosecution's mental health expert, Dr. Daniel Martell, a forensic neurologist, whom the referee found to be "a very credible witness." "Dr. Martell noted that even without testing, Dr. Pierce and Dr. Benson observed the same symptoms early in the case. Dr. Martell observed two kinds of problems: psychiatric disorders and organic brain dysfunction. Some of the observed deficits in testing (low I.Q. and problems in executive functioning) are symptoms of organic brain dysfunction; paranoid ideation and delusions are symptoms of psychiatric disorders. Indeed, Dr. Martell was struck by the consistency of the description from the doctors over time: Everyone seemed to be describing the same person, the same constellation of problems all the way back to the penalty phase of the trial. Thus, Dr. Martell concluded, even though Dr. Pierce and Dr. Benson did not have the benefit of the neuropsychological testing, they got the fundamental diagnoses right and were validated by the subsequent doctors that examined Welch."

Nonetheless, "Dr. Martell found that Welch's behavior at the time of the crime contradicted his doctors' testimony that his frontal lobe damage affected his ability to control his behavior at the time of the murders. For example, Welch was

30

able to lie in wait, sit in his car and wait for the police to leave. Also, he brought a fully loaded UZI machine gun to the crime scene — evidence of planning and organization. Welch thought about what he wanted to do, brought a weapon appropriate to the task, made sure it was loaded, and waited until the police left the area.

"In addition Dr. Martell found there was a certain systematic approach to his behavior during the crime. Welch went through the house stating, 'Where is Chuck at?' indicating Welch knew Chuck was not where he was supposed to be. Welch said 'This one's for you' before shooting the victims, which showed a systematic pursuit to eliminate witnesses from both his trial and from what he was doing that night. Dr. Martell opined that both of those things showed intact planning, organization, and lack of impulsivity. Dr. Martell found that Welch's prior threats to do exactly what he did is relevant too: it demonstrated that he had a plan, he told people of his plan, developed it for a reason, and carried it out. Dr. Martell noted that those are all frontal lobe executive control functions that, at that time, were intact and operating effectively. Welch's choice of the time to commit the crime — the middle of the night when the victims would be asleep and were easier targets — again showed thinking and planning on how to murder a large number of people. It was the best way to control the victims and to prevent them from interfering with what Welch was trying to do. This was goal-directed behavior. Finally, Welch's behavior after the crime — burning the clothing he was wearing, putting the weapon[s] in a pillowcase and leaving it in a cousin's yard — showed that Welch was cognitively intact enough to understand that he needed to get rid of evidence that might later connect him to the crime. This was organization, planning and goal-directed behavior which showed Welch was functioning at a much higher level than the doctors testified he would have been able to."

31

The referee accordingly found that "had additional evidence about child abuse and its effects on Welch been introduced at the penalty phase, the prosecution would have introduced evidence to impeach and therefore rebut that evidence like that offered by Dr. Martell. Dr. Martell contradicted Dr. Kriegler's assertion that Welch was not in control of his actions because his psychiatric impairments were affecting his behavior at the time of the crime in significant ways."

Welch objects that Dr. Martell's testimony was not actually rebuttal evidence because, Welch contends, he never put his state of mind at the time of the crime at issue and would have sought to introduce only in a more general way the mitigating evidence regarding child abuse, neurological deficits, and mental illness. Nonetheless, at the penalty phase of a capital trial, testimony such as Dr. Martell's may well have diminished the weight of the mitigating evidence in the eyes of reasonable jurors by dissolving the link between Welch's child abuse and mental illness and his commission of six murders. Thus, Dr. Martell's testimony qualifies as penalty phase rebuttal evidence relevant to determining the significance of the child abuse evidence.

Welch also objects to the referee's finding that Dr. Martell's testimony supported the conclusion that Welch was engaged in deliberate, goal-directed behavior, as opposed to impulsive conduct, when he committed the murders. Welch points to declarations by his former girlfriend and codefendant, Rita May Lewis, as well as others who had contact with Welch on the day and night of the murders, observing that Welch was drinking alcohol and using cocaine and heroin, and that the murders were "impulsive and committed at a time when Welch was at most semi-conscious." But the jury at Welch's trial rejected defense counsel's primary guilt phase argument that Welch's impairment from alcohol, cocaine, and heroin foreclosed his capacity for premeditation and deliberation in commission of

the murders.  (See *Welch*, *supra*, 20 Cal.4th at p. 725.)  The trial record provides substantial evidence in support of the referee's finding that the prosecution would have introduced rebuttal evidence like Dr. Martell's testimony and that such testimony would have suggested that Welch committed the murders in a deliberate fashion.

### B.  Analysis

"An ineffective assistance claim has two components:  A defendant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

#### 1. *Deficient performance*

"To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' [Citation.]" (*Wiggins*, *supra*, 539 U.S. at p. 521.)  The adequacy of counsel's representation must be evaluated against "the professional norms prevailing when the representation took place." (*Bobby v. Van Hook* (2009) 558 U.S. 4, 7.) "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland*, *supra*, 466 U.S. at pp. 690–691.)

In *Wiggins*, the high court found that counsel's investigation into the defendant's social history was inadequate.  (See *Wiggins*, *supra*, 539 U.S. at pp. 523–534.)  Counsel had obtained a psychologist's report that indicated Wiggins's IQ and signs of a personality disorder but "revealed nothing . . . of petitioner's life history." (*Id.* at p. 523.)  Counsel had also obtained a presentence investigation report and records from the Baltimore City Department of Social Services (DSS) documenting Wiggins's history in foster care.  (*Id.* at pp. 523–

33

524.)  The high court held that counsel's decision not to further investigate Wiggins's upbringing fell short of Maryland's capital defense standards at the time and also "fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we have long referred as 'guides to determining what is reasonable.'  *Strickland*, *supra*, at 688; *Williams v. Taylor* [(2000) 529 U.S. 362, 396].  The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.  Cf. *id.*, 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences (emphasis added)); [citation]."  (*Id.* at p. 524.)

Further, the DSS records showed that Wiggins experienced difficulties in school and foster care, and that Wiggins's mother was an alcoholic and at least once "left him and his siblings alone for days without food."  (*Wiggins*, *supra*, 539 U.S. at p. 525.)  The high court said "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background."  (*Ibid.*)  "Even assuming [Wiggins's attorneys] limited the scope of their investigation for strategic reasons" — counsel had decided to focus in the penalty phase on disproving Wiggins's direct responsibility for the murder — "*Strickland* does not establish that a cursory

34

investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." (*Id*. at p. 527.)

Welch's penalty trial began in June 1989, just four months before Wiggins's. (*Wiggins*, *supra*, 539 U.S. at p. 515.) Here, as in *Wiggins*, counsel had obtained expert opinion on the defendant's mental health and two sets of records. The experts, Dr. Benson and Dr. Pierce, conduct evaluations that indicated mental illness but "revealed nothing . . . of [Welch's] life history." (*Id*. at p. 523.) Welch's school records revealed "problems at school, like difficulties concentrating, in getting along with others, in getting counseling and studies." Welch's juvenile and criminal history records showed that he "grew up with the Probation Department. Countless probation reports. They tracked him from his first experience as a juvenile . . . ."

Counsel made no further effort to seek social history information about Welch after his parents refused to cooperate. Setting aside whether counsel made adequate efforts to contact Welch's sister Cathie Thomas, the referee found that no one on the defense team sought to contact his aunt Sarah Perine, his uncle Roy Millender, or any of his teachers, classmates, coworkers, neighbors, probation officers, or others who "had encounters with petitioner in his developmental years and were available." Counsel decided to forgo additional investigation believing that the records they had were enough and that "if the jury did not believe Petitioner was mentally ill, nothing they could do would make a difference at the penalty phase." But the referee found no evidence that contacting additional witnesses would have been "fruitless" or "counterproductive" (*Wiggins*, *supra*, 539 U.S. at p. 525) or likely to yield "only cumulative" information (*Bobby v. Van Hook*, *supra*, 558 U.S. at p. 11). Even if counsel acted reasonably in focusing on a

mental illness defense, it is unclear why counsel believed Welch's family and social history could not have aided that defense.

The referee also noted that Thomas Broome, who represented Welch before Selvin took over the case, testified at the reference hearing that Welch's mother Minnie "told Mr. Broome that petitioner's father was very abusive towards her and petitioner. Mr. Broome did not communicate this to Mr. Selvin or Mr. Strellis [Selvin's cocounsel], or to Dr. Pierce. There also was no information regarding this fact in his file." Thus, although defense counsel was alerted early on to Welch's childhood abuse, the information never reached Welch's penalty phase counsel.

On this record, the referee concluded that "the trial attorneys, in ending their efforts when stonewalled by petitioner and his parents, conducted an inadequate penalty phase investigation. Competent counsel would have sought (either themselves or through an investigator) to obtain social history information from other sources about petitioner's mental health, child abuse and social history." Relying on *Wiggins* among other cases, Welch makes a strong argument that the referee's conclusion was correct. But we need not definitively resolve whether counsel's performance was adequate because the high court has said "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.) As explained below, Welch has not made a sufficient showing of prejudice here.

### 2. Prejudice

In order to establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at

36

p. 694.) A defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Id.* at p. 693.) Rather, he must show "a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

The high court has made clear that under some circumstances, failure to introduce mitigating evidence of child abuse or other disadvantages is prejudicial. In *Williams v. Taylor* (2000) 529 U.S. 362, the high court found deficient performance and prejudice when trial counsel failed to investigate and introduce "extensive records graphically describing Williams' nightmarish childhood," which included the imprisonment of Williams's parents for "criminal neglect of Williams and his siblings." (*Id.* at p. 395.) Williams's case involved considerable aggravating evidence, including the robbery murder of an elderly woman and prior convictions for armed robbery, burglary, and grand larceny. Nonetheless, the high court found the failure to introduce the mitigating evidence was prejudicial. Even if evidence that Williams turned himself in, expressed remorse for his actions, cooperated with the police, and behaved well in custody "may not have overcome a finding of future dangerousness, the graphic description of Williams's childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." (*Id.* at p. 398.)

In *Wiggins*, the defendant was convicted of robbing and murdering a 77-year-old woman. The only evidence offered in mitigation was that Wiggins had no prior convictions. In finding defense counsel's inadequate investigation of Wiggins's upbringing to be prejudicial, the high court said: "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his

37

mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (' "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse" ') . . . ." (*Wiggins*, *supra*, 539 U.S. at p. 535.) "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." (*Id.* at p. 537.)

In *Rompilla v. Beard* (2005) 545 U.S. 374, the defendant had tortured his murder victim and had suffered a number of prior felony convictions involving the use or threat of violence. Against this considerable aggravating evidence, the mitigating evidence consisted of brief testimony from family members pleading for mercy and arguing lingering doubt. (*Id.* at p. 378.) The high court determined that competent counsel would have uncovered evidence of borderline mental retardation, organic brain syndrome and fetal alcohol syndrome, and a severely abusive childhood in which Rompilla's father "beat him when he was young with his hands, fists, leather straps, belts and sticks," and "locked [him] and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled." (*Id.* at p. 392.) *Rompilla* went on to hold: "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of [Rompilla's] culpability,' [citations], and the likelihood of a different result if the evidence had gone in is 'sufficient to

38

undermine confidence in the outcome' actually reached at sentencing [citation]." (*Id.* at p. 393; see also *Sears v. Upton* (2010) 561 U.S. 945 [granting a petition for postconviction relief, vacating judgment, and remanding where trial counsel failed to produce mitigating evidence of the defendant's abusive childhood and low cognitive function, including his ability to suppress competing impulses]; *Porter v. McCollum* (2009) 558 U.S. 30 [unanimously reversing penalty phase conviction where trial counsel failed to introduce mitigating evidence that the defendant was a Korean War veteran who had been traumatized by an abusive childhood and his combat experiences].)

In this case, we must compare the evidence actually presented during the penalty phase with the evidence that likely would have been presented if counsel had further investigated Welch's social history. Our starting point is the aggravating evidence, which was extraordinary even for a capital case. The six murders themselves, two of small children, "stood for decades as the largest mass killing in Oakland's 160-year history." (Bender & Harris, *Oikos University Killings Surpassed 1986 Mass Murder as Oakland's Most Deadly*, San Jose Mercury News (Apr. 7, 2012).) Moreover, the jury learned of Welch's history of persistent violence, including the assault and subsequent intimidation of Barbara Mabrey and various other Mabrey family members and their friends, as well as the rape and sodomizing of a former lover. The jury heard evidence of many instances of Welch's violence in a correctional setting or against police officers while resisting arrest, reflecting the fact that Welch had spent much of his life in custody. (See *Welch*, *supra*, 20 Cal.4th at pp. 725–727.) Evidence of violence while in custody can be particularly significant to capital juries, and the prosecutor in closing argument highlighted Welch's future dangerousness based on his past crimes. (See *id.* at p. 761.) No evidence presented at trial or at the evidentiary hearing presented Welch in a positive light or as having any redeeming qualities.

39

The mitigating evidence from Welch's aunt Sarah Perine, his uncle Roy Millender, and his sister Cathie Thomas (assuming for purposes of this analysis that Thomas would have been available) would have described Welch as a victim of child abuse. According to the referee, the evidence would have shown that Welch's father repeatedly physically abused him over many years and that Welch was psychologically impaired as a result, exhibiting persecutory paranoid delusions. Welch also witnessed his father repeatedly abuse his mother. The effects of this abuse were also manifested in and compounded by his neurological impairment, as evidenced by his speech impediment, lack of coordination, struggle in school, and inability to self-regulate. The effects of the abuse and the accompanying impairment were further compounded by a history of substance abuse starting as early as age 10 or 12 as a means of self-medication.

The referee found that this child abuse evidence would not have changed the substance of Dr. Benson's diagnosis of Welch but would have changed "only the terminology of his diagnosis" from "organic brain disease" to "traumatic brain disease." "Nonetheless," the referee said, "his testimony would have been somewhat different. Dr. Benson's diagnosis would have been more certain and more grounded in fact. An expert's opinion is only as good as the facts upon which his or her opinion is based. More basis in fact may lend more credibility to an expert's opinion. Here, the opinion Dr. Benson offered the jury would have been supported by additional facts testified to by the social history witnesses."

We agree with the referee that "[m]any new facts would have solidified Dr. Benson's diagnosis: information that as a child petitioner's appearance was sickly, he had trouble breathing, he had trouble keeping up in school, he had difficulties controlling his urine output, he lived a life of poverty, he was malnourished, and he was singled out for physical abuse by his father." Even so,

40

however, two considerations lead us to conclude that Welch has not shown a reasonable probability of a different penalty verdict.

First, it is likely that the jury, without the social history evidence, already perceived Welch as having a serious mental disease. Welch's own attorney said during penalty phase closing argument: " 'The simple thing, Ladies and Gentlemen, is there really any one of you who doesn't think that my client is crazy? [¶] Really? Is there any one of you who sits there and who honestly can say that they don't think Mr. Welch is crazy?' " (*Welch*, *supra*, 20 Cal.4th at p. 764, fn. 10.) In previously rejecting Welch's claim that this line of argument by his attorney constituted ineffective assistance of counsel, we said: "Read in context, . . . the use of that resonant colloquial term appears to have been an attempt to move beyond legalisms to appeal to the jury's likely perception that there was something psychologically quite wrong with [Welch]." (*Id.* at p. 764.) Thus, the difficulty Welch likely faced at the penalty phase was not the jury's disbelief that he was mentally ill, but rather the jury's skepticism that his mental illness sufficiently mitigated his culpability for the six murders so as to warrant a life sentence.

Second, and related, the prosecutor emphasized in his cross-examination of Dr. Benson and Dr. Pierce that Welch acted with planning and deliberation, not out of impulse, in committing the murders. In particular, the prosecutor drew attention to the facts that Welch had said he could have access to an Uzi any time he wanted to take care of problems; that Welch had earlier said he would come back to the Mabrey home and kill everybody when the police were gone; that Welch in fact waited until no police were in the area and entered the house during the early morning hours; that Welch brought a loaded Uzi to commit the murders; that Welch said, " 'this is for you, bitch' " when he shot Dellane Mabrey; that Welch went around the house looking for Chuck after shooting several victims;

41

and that Welch fled to a safe house after committing the murders. Against Dr. Benson's and Dr. Pierce's insistence that Welch acted with impaired capacity to conform his conduct to the law, the prosecutor emphasized that the facts showed Welch had the presence of mind to plan and carry out the murders and to appreciate the criminal nature of his conduct. Although evidence of child abuse would have bolstered the diagnoses of mental illness and perhaps lessened the force of the prosecutor's *general* attack on the experts' credibility and diagnoses, we see no reasonable probability that a firm diagnosis of mental illness would have cast doubt on the prosecutor's *specific* argument that any mental illness Welch might have had did not impair his capacity *at the time of the murders* to appreciate the criminality of his conduct or to conform his conduct to the law. As we have recognized, the connection between the abuse suffered and the capital crime is a significant factor in determining whether the failure to introduce evidence of abuse was prejudicial. (See *In re Crew* (2011) 52 Cal.4th 126, 153; *In re Visciotti* (1996) 14 Cal.4th 325, 355.)

Moreover, as the referee found, if the defense had introduced the child abuse evidence, the prosecution likely would have countered with expert opinion like Dr. Martell's amplifying the thesis that "petitioner's behavior on the night of the crime did not show impulsivity. Being able to plan, be goal directed and organized showed frontal lobe executive control functions that were intact and operating effectively at that time. The prosecution thus would have presented expert opinion that petitioner was functioning at a much higher level during this time span than what the defense theory posited he would have been able to."

To be sure, apart from any connection to the crime, evidence of childhood abuse, deprivation, or neurological impairment can be used to humanize a capital defendant and elicit the jury's sympathy. But in light of the enormity of Welch's crimes and the lack of evidence of any positive qualities he possessed, we doubt

42

that any sympathy for Welch based on the abuse he suffered as a child would have altered the jury's penalty verdict. As noted, the child abuse evidence consisted of testimony that Welch's father spanked Welch with a belt, extension cord, or shoe once a week for period of time in his early childhood and less frequently after that, that Welch's father frequently beat Welch's mother, that Welch lived in poverty and was malnourished, and that Welch's father disciplined Welch by hitting him and making him "go to jail," i.e., go in the closet. Although no amount of child abuse can be condoned or tolerated, we do not believe that this mitigating evidence, when compared with the totality of the aggravating evidence against Welch, would have had a reasonable probability of success. (Cf. *In re Crew*, *supra*, 52 Cal.4th at p. 153 [evidence of the petitioner's "dysfunctional family might have elicited some jury sympathy for him at the penalty phase of his capital trial," but "petitioner showed no causal connection between his family environment and his cold-blooded and calculated decision to brutally murder his wife"].)

In sum, the prejudice inquiry requires us to examine whether it is reasonably probable, not merely possible, that at least one juror who sat on Welch's case would have reached a different result if the child abuse evidence had been available. The jury likely perceived Welch to be mentally ill but did not believe his mental illness sufficiently mitigated the murders to warrant a life sentence. We do not believe the available child abuse evidence would have strengthened the mental illness defense to such a degree that, despite the enormity of the aggravating evidence, a different outcome was reasonably probable. And it is not reasonably probable that the child abuse evidence in and of itself would have elicited such sympathy from the jury as to outweigh the considerable aggravating evidence.

Because Welch has not met his burden of demonstrating prejudice, we deny his request for relief from his death sentence on grounds of ineffective assistance of counsel.

## CONCLUSION

Welch has not established that he is entitled to habeas corpus relief on his claim of juror misconduct and on his claim that his trial counsel was ineffective for not investigating and presenting certain mitigating evidence at the penalty phase of his capital trial. Because our order to show cause and our reference order were limited to these claims, we do not here address any other claim set forth in his habeas corpus petition, which will be resolved by separate order. (*In re Crew*, *supra*, 52 Cal.4th at pp. 153–154.)

The order to show cause is discharged.

**LIU, J.**


**WE CONCUR:**

          **CANTIL-SAKAUYE, C. J.**
          **WERDEGAR, J.**
          **CHIN, J.**
          **CORRIGAN, J.**
          **CUÉLLAR, J.**
          **KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Welch

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S107782
**Date Filed:** June 22, 2015

_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

Wesley A. Van Winkle, Stephanie Ross and Karen Kelly, under appointments by the Supreme Court, for Petitioner David Esco Welch.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald S. Matthias and Gerald A. Engler, Assistant Attorneys General, Bruce Ortega, Glenn R. Pruden and Catherine A. Rivlin, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Wesley A. Van Winkle
P.O. Box 5216
Berkeley, CA  94705-0216
(510) 848-6250

Catherine A. Rivlin
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5977