Filed 3/19/24  P. v. Angulo CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>FELIPE JESUS RIOS-ANGULO,<br><br>        Defendant and Appellant. | A167235<br><br>(Solano County<br> Super. Ct. No. FCR337332) |

Defendant Felipe Jesus Rios-Angulo (defendant) repeatedly sexually molested his wife's cousin (victim) starting when she was 13 years old, and a jury convicted him of eighteen counts of sexual offenses.  On appeal, defendant contends the prosecutor committed prejudicial misconduct during closing argument; he was deprived of the effective assistance of counsel; and the trial court erred in not allowing live testimony in connection with his motion for new trial.  We affirm.

# I. BACKGROUND[1]

In 2018, the People charged defendant with nine counts of lewd act on a child under 14 years old (Pen. Code, § 288, subd. (a)[2]), three counts of forcible lewd act on a child (§ 288, subd. (b)(1)), and six counts of lewd act on a child who was 14 years old by a person at least 10 years older than the child (§ 288, subd. (c)(1)).

## A. Prosecution Case

### 1. Victim's Testimony

In April 2016—when she was 13 years old—the victim started spending more time with her aunt Irma A., uncle Ubaldo A., and their five daughters.[3] She often went to their house, where they all lived together.  Her cousin Yasmin M. was married to defendant, who was 27 years old at the time.[4] Yasmin and defendant had two children.

During the summer of 2016, the victim went to her family's home a few times a month.  The first incident of sexual molestation occurred in the early part of that summer, when the victim went to her family's house to swim in their pool.[5]  After swimming, she went to Yasmin and defendant's room to

---

[1] We provide an overview of the facts here and additional facts in connection with our discussion of defendant's claims.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] To protect their privacy, when we identify family members by name, we refer to them by their full first names and last initials and, subsequently, by their first names.  (Cal. Rules of Court, rule 8.90(b)(10).)  The victim's parents and her cousins' parents are sisters and brothers—their mothers are sisters and their fathers are brothers.

[4] Yasmin's legal first name is Hacna.  She goes by Yasmin and was referred to as Yasmin throughout trial.  We refer to her as Yasmin.

[5] The victim testified that there were two different pools at the house. The first pool was round and she swam in it a few times during the summer

look for a hair brush, and defendant was there and offered to brush her hair. After defendant brushed her hair, "he started kissing" her on her mouth and her neck, chest, and ear. He lowered her shirt and bra to kiss her chest, and he moved his hands around her body. The incident ended when defendant's daughter knocked on the door, which he then unlocked.

The next incident occurred a week later. When she came out of the bathroom, defendant pulled her into the laundry room and sexually molested her once again.

In the fall of 2016, the victim began eighth grade and continued to go to her family's house about once a week. On one occasion, defendant again pulled her into the laundry room, closed the door, and kissed and groped her. He made her touch his penis. He took her from the laundry room into his bedroom and locked the door.[6] He put her on his bed, got on top of her, pulled her clothes off, sucked her breasts, touched her clitoris and vagina, rubbed his penis around her vagina and put his fingers in her vagina. Someone tried to open the door and she heard Yasmin say, " 'Who locked my room?' " Defendant ran out the door leading to the yard, and the victim got dressed. Yasmin then "opened the door with her keys, and she said, 'Why did you have

---

of 2016. Her family removed that pool in the summer of 2016 because they were hosting a bridal shower. In 2017, they got a second pool, which was a different shape than the first pool.

[6] Defendant, Yasmin, and their children lived in the garage which had been converted into a bedroom. Their room had two doors—one to the backyard and the other to the laundry room. The laundry room had another door accessing the hallway. The victim testified the door between Yasmin and defendant's room and the laundry room had a lock, which defendant used when he brought her into his room. The house had two bathrooms, one in the hallway and one in her aunt's room, which locked.

the door locked?' " On other occasions, defendant put his penis in her mouth and partway in her vagina.

From the time the molestation started in the early summer of 2016 through October 2017, defendant sexually abused the victim almost every time she went to their house. Defendant also texted her that he loved her, texted her pictures of his penis, and asked her to send pictures of herself. He sent her messages on Instagram, including messaging that he wanted to kiss her while they were in the same room with her mother. The incidents stopped in October 2017 because her grandfather was sick and they stopped visiting her family and defendant.

At some point when the victim was in eighth grade, she told one of her friends about what was going on with the defendant. In late-2017, she also told her uncle Enrique M.G.

The victim admitted that when she was interviewed by the police and asked if defendant had put his penis in her mouth or her vagina, she told them no, which were lies. She "felt embarrassed" discussing this in front of her mom, and "didn't want to be there."

## 2. Other Testimony

The victim's friend testified that in the spring of eighth grade—spring 2017—the victim told her she was "being treated inappropriately" by her cousin's husband and "felt unsafe." The victim said it had started the prior summer when she went to their house to swim. The victim's uncle Enrique testified that around October or November 2017, the victim told him defendant was touching her inappropriately.

The victim's mother testified there was a round pool at her sister's house in 2016, which was removed before a bridal shower. They subsequently bought a larger, rectangular pool.

4

## B. Defense Case

Regarding when there was a swimming pool at their house, Yasmin, two of her sisters, and her mother testified they only had one pool, it was purchased in 2017, and they did not have a pool before that.

Yasmin testified there was a door from her bedroom into the laundry room and another door to exit the laundry room, neither of which had locks. She then testified there was a lock on the door between her bedroom and the laundry room, but she did not have a key.

One of Yasmin's sisters testified the door to Yasmin and defendant's bedroom did not lock. Another sister testified there were no locks on the doors going into the laundry room. She later testified there was a lock on her bedroom door, her parents' bedroom door, and there were "[p]robably" locks on the other bedroom doors.

When asked if there were locks on the bedroom doors, Yasmin's mother testified, "I don't know what you mean by locks." She then testified that her bedroom door and all of the bedroom doors locked, but not with keys. The door between the laundry room and the garage bedroom had a lock, but it was not there in 2016 and 2017. They had recently installed locks on all of the doors. Prior to that, the doors locked, but not with keys.

## C. Verdict and Sentencing

A jury convicted defendant on all counts, and the trial court sentenced him to 50 years in prison and imposed lifetime sex offender registration.

## II. DISCUSSION

Defendant raises three issues on appeal. He contends the prosecutor committed prejudicial misconduct during closing argument when she accused the defense witnesses of committing perjury; he was deprived of the effective assistance of counsel; and the trial court erred in not allowing live testimony

5

in connection with his motion for new trial.  We address each issue in turn below.

## A. *Prosecutorial Misconduct*

Defendant argues the prosecutor committed prejudicial misconduct during closing argument when she accused the defense witnesses of committing perjury.  The Attorney General contends defendant forfeited this claim, and we agree.

### 1. **Additional Facts**

In closing argument, the prosecutor attacked the defense's theory of the case.  She identified four reasons the defense would claim the jury should not believe the victim, and then sought to discredit those reasons.  One reason, the prosecutor suggested, was that the victim was lying or mistaken about "collateral facts," like whether there was a swimming pool at the house in the summer of 2016.  The prosecutor stated that the testimony about the pool— and the timing of when it was at the house—was disputed between the victim and other prosecution witnesses and the defense witnesses.  This meant, the prosecutor explained, someone had lied.  The prosecutor reasoned the victim had no reason to make up a swimming pool if her allegations of abuse were fake, while defendant's witnesses had a reason to lie about whether they had a pool in 2016.  They wanted to make the victim look like a liar so the jury would find defendant not guilty.

The prosecutor stated, "[A]nd I think that by watching their testimony on the stand, you will clearly see the difference in quality of the testimony between the defendant's wife, her mother, and her sisters and what was told to you from [the victim] and the other prosecution witnesses when you consider how they testified, when you consider their motives.  It's easy to see that a lot of the things they said are simply not true.  Okay.  [¶] But as big of

6

a deal as it is, to come in here and tell lies on the stand, to commit perjury, you know, we're still people."

### 2. Analysis

To "preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943.)

Defendant forfeited his claim of prosecutorial misconduct. It is undisputed that defendant's trial counsel did not object to the prosecutor's statements nor request an admonishment. Defendant contends we may nevertheless review his claim because, he urges, an admonition would not have cured the alleged harm. He asserts the prosecutor's "false accusation of committing" perjury could not "be unheard by the jury." "There is no un-ringing of that bell," he contends. Not so. "We presume that a jury follows the court's admonishments." (*People v. Schultz* (2020) 10 Cal.5th 623, 673; see also *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 ["we presume jurors can 'unring the bell' and follow admonishments and instructions designed to cure" an error].) Therefore, we may not excuse defendant's failure to object and request an admonition because he did not demonstrate that an admonition would not have cured the alleged harm. (See *People v. Hoyt, supra*, 8 Cal.5th at pp. 942–943.)

### B. Ineffective Assistance of Counsel

Defendant next argues he was deprived of the effective assistance of counsel based on his counsel's failure to object to the prosecutor's alleged misconduct, which forfeited the claim on appeal.

### 1. Additional Facts

After each side concluded their presentation of evidence, the trial court instructed the jury, "[Y]ou must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial." The court advised, "[N]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. . . . Only the witnesses' answers are evidence." "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. . . . You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe."

During closing argument, the prosecutor reminded the jury, "[Y]ou are the fact finders. I am not the fact finder. It is not my job to say that I believe [the victim] or I don't . . . . [¶] [Y]ou, the jurors, are the fact finders and it is your opinions and your assessment of witness credibility that's important here."

### 2. Analysis

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) To succeed on an ineffective assistance of counsel claim, a defendant must show "by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 . . . .)" (*People v. Centeno* (2014) 60 Cal.4th 659,

8

674.) However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland*, at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Ibid.*)

To "establish prejudice, a defendant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*In re Welch* (2015) 61 Cal.4th 489, 517.) A defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Here, defendant makes no attempt whatsoever to meet his burden of demonstrating how any alleged deficient performance of his trial counsel resulted in prejudice. Defendant's claim fails for this reason alone. (See *People v. Centeno, supra*, 60 Cal.4th at p. 674 [burden is on defendant to demonstrate prejudice].)

Further, we agree with the Attorney General that defendant suffered no prejudice due to his counsel's failure to object to the prosecutor's statements and to request an admonishment. The trial court's jury instructions eliminated any potential prejudice. The court instructed the jury that counsel's remarks in closing arguments were not evidence, the jury was the only judge of the witnesses' credibility and believability, and it was up to them to decide the facts. (*See People v. Friend* (2009) 47 Cal.4th 1, 84 [no prejudice as trial court instructed jury that counsel's arguments were not evidence and the jury should rely on its own recollection of witness testimony].) We presume the jury complied with the court's instructions.

9

(*People v. Flinner* (2020) 10 Cal.5th 686, 717.) Additionally, the prosecutor reminded the jury it was their role to assess witness credibility.

Defendant's ineffective assistance of counsel claim fails because he did not demonstrate there is a reasonable probability the result of the trial would have been different had his counsel objected to the prosecutor's statements and requested an admonishment.

## C. Live Testimony in Connection with Motion for New Trial

Defendant contends the trial court abused its discretion in not allowing live testimony from the victim's father in connection with defendant's motion for new trial.

### 1. Additional Facts

Four months after the verdict, defendant moved for a new trial pursuant to section 1181 based on, as relevant here, newly discovered evidence. He submitted a statement from the victim's father, Juan A.M., stating his brother Enrique and sister-in-law Rosa M. had come up with a plan to get money from defendant.[7] Defendant had been injured and was about to receive a lump sum payment, and Juan's brother and sister-in-law convinced his wife and daughter to accuse defendant of molesting his daughter. During this process, there "were many lies that they came up with," including telling his "daughter to say that [defendant] forced her to touch him and forced her to have sex with him." During this period Juan was ill and eventually had a stroke. His wife and daughter mistreated him. In September 2022, his wife kicked him out of the house because he could no longer assist financially. He requested his statement remain confidential

---

[7] Defendant refers to the statement as a "declaration," which it is not, as it does not include a statement certifying that it is true under penalty of perjury. (See Code Civ. Proc., § 2015.5.) Nor is it an affidavit. (See Code Civ Proc., § 2003 [affidavit is a "written declaration under oath"].)

10

because he feared for his life, explaining his wife, brother and sister-in-law had "threatened [him] by saying that [he] could die and something could happen to [him]." The statement was typed, in English, included Juan's signature, and was notarized on October 26, 2022. Defendant argued Juan's statement undermined the victim's credibility and the strongest evidence against defendant because it provided a motive for why the victim made her accusations.

In opposition, the People argued Juan's statement was not credible and did not constitute new evidence because it did not represent his genuine statements or reflect anything he would honestly testify to at a new trial. The prosecutor submitted a declaration stating, in late-November 2022, she and a district attorney investigator met with Juan at her office. A district attorney employee assisted with Spanish interpretation. Juan informed the prosecutor he did not write the letter and while the signature was his, he did not read the letter before signing it. He had left the home where he lived with his wife and children and was homeless. During that time, his brother Ubaldo—Irma's husband, Yasmin's father, and defendant's father-in-law—contacted him and paid for a hotel room for Juan. One night, Ubaldo spent time with Juan at the hotel; they drank alcohol and Juan got very drunk. Ubaldo made statements disparaging Juan's wife and "suggested that they write a letter which would 'take her down.'" Juan drunkenly agreed, and the next morning Ubaldo returned with a prepared, typed letter. Juan still felt the effects of drinking when he signed the letter. He "felt that he had been 'manipulated' by his brother." He stressed he had not read the letter and he did not know what it said. He asked the prosecutor to tell him what the letter said, but she would not.

11

At this meeting, Juan informed the prosecutor he suffered a debilitating stroke two years earlier. The prosecutor observed his cognition was somewhat limited. Juan explained he understands a good deal of English but is limited with reading and writing in English. He spoke in Spanish for most of their conversation. At the time he spoke with the prosecutor, he was living back at home. When she asked if he felt safe there, he did, stating " 'there is no safer place for me than home.' "

In reply, defendant argued Juan's evidence was credible. He argued Juan had an incentive to retract his statement because he was now living at home.

The People contended that even if Juan would testify to everything included in his statement, it did not warrant a new trial because it merely constituted impeachment of the victim's testimony. The People argued the circumstances under which the statement was supposedly written undermined Juan's credibility—even assuming he authored the statement, he did so after he stopped living at home due to conflict with his wife, therefore he had a motive to lie to hurt his wife. His situation was further complicated because he was homeless at the time Ubaldo paid for his hotel room, providing further incentive to fabricate facts.

Defendant then filed a declaration from Ubaldo, where he explained the circumstances surrounding Juan's statement and reiterated that Juan told him his wife, brother, and sister-in-law conspired to induce the victim to make up lies about defendant. Juan told him he wanted to write a letter telling the truth. Over the phone, Juan told Ubaldo's daughter everything he wanted to say, which she typed, repeated back to Juan, then emailed to them. Juan read the letter and asked to get it notarized.

In late-December 2022, defendant requested live testimony so the court could determine Juan's credibility; the People opposed. The parties' briefing on the topic revealed further information.

Earlier in December, defense counsel had provided the prosecutor a handwritten statement, claiming Juan wrote it. The statement was dated October 26, 2022—the date Juan's typed statement was notarized—and repeated the claim that his brother and sister-in-law wanted to get money from defendant so they convinced his wife and daughter to press charges, and these were lies.

A few days after Juan met with the prosecutor, the defense investigator approached Juan, and the investigator reported that Juan confirmed his daughter was lying and had been manipulated by his wife. He was upset that his family had abandoned him. He confirmed he had signed a statement regarding this matter, and it was the truth. Juan appeared to understand English and never indicated he did not understand the investigator's questions.

In early-January 2023, the prosecutor and district attorney investigator again met with Juan. In her report, the investigator stated Juan denied the claims in his original statement. They showed him a copy of a handwritten letter with what appeared to be his signature, and he denied writing it. When asked about his meeting with the defense investigator, he did not remember ever meeting with him. According to the interview transcript, Juan stated everything was "fine at home" and he felt "safe at home." The prosecutor showed him the original, typed statement. He again confirmed he did not write it and did not know what it said. He signed the letter before a notary at a print shop. The prosecutor allowed him to read the statement. He had not known it included statements about his brother and sister-in-law

coming up with lies to have his daughter claim defendant forced her to touch him and have sex with him, and if he had read that he would have been angry with Ubaldo and would have left the print shop. He never saw his family manipulating his daughter to tell lies. They did not threaten him. Ubaldo came up with the lies. Regarding the handwritten letter, he had never seen it and it was not his handwriting or his signature. When asked if he thought his daughter was lying, he replied, "My daughter does not lie."

At that meeting, Juan provided the prosecutor with medical records following his stroke. In November 2021, a doctor noted "his memory problems seem to have worsened as he is unable to remember a lot of things." In June 2022, Juan complained of a worsening memory.

Later in January 2023, Juan arrived, with his son, unannounced at the district attorney's office and requested to speak with the prosecutor. The prosecutor summarized that Juan explained Ubaldo tracked him down and angrily confronted him about the situation "involving 'the letter.'" Juan was worried because Ubaldo told him he could go to jail for what he had done regarding the statement, and Ubaldo advised Juan he should go to Mexico. The son interjected that when Juan had first relayed this story, his father remembered Ubaldo stating that he was going to have Juan " 'sent' " to Mexico.

In February 2023, the trial court heard defendant's motion for new trial. The court denied defendant's request for live testimony and his motion. The court discussed Juan's initial, notarized statement and his subsequent statements. It determined there was "sufficient information provided in the written statements by both sides to make a determination as to the credibility of" Juan. It explained that Juan had suffered a stroke in 2020, which affected his memory, and therefore the court was asked to put a person

14

on the witness stand that does not really recall anymore what he said. The court explained the statements submitted by both sides indicated Juan was "not really sure what he said. Regardless of whether he says it under oath in the court, or he said it in the past, it's not going to help this [c]ourt in any way to have him testify under oath to make it live testimony."

The trial court explained that even if it found Juan to be credible, the statements in the initial document were not "new evidence in the sense that it is not going to make a difference to the outcome of" a new trial. His statements would be "just impeachment information" as to what the victim and her mother testified to, and "impeachment information doesn't make it new evidence." The court reiterated that even if Juan's statements were credible, "the credibility of the witness is not determinative of the issues presented here" because it only concerned "impeachment and not the merits of the case." Additionally, physical evidence—text messages between the victim and defendant—corroborated the witnesses' testimony. Therefore, Juan's statement did not "constitute new evidence," and the court denied a new trial.

## 2. Analysis

Section 1181, subdivision (8) authorizes a new trial based on newly discovered evidence which is "material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." When deciding whether to grant a new trial under this provision, the trial court considers whether (1) the evidence (not just its materiality) is newly discovered; (2) the evidence is not cumulative; (3) the evidence would have rendered a different result probable on retrial; (4) the party could not with reasonable diligence have discovered and produced the evidence at trial; and (5) the new facts are shown by the best admissible evidence. (*People v.*

*O'Malley* (2016) 62 Cal.4th 944, 1016–1017.)  The " 'court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' " (*People v. Delgado* (1993) 5 Cal.4th 312, 329.)

A live evidentiary hearing is not required for a trial court to assess credibility.  (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 [trial court was able to assess credibility and resolve evidentiary conflicts with declarations and other documentary evidence]).  Indeed, as our high court explained in *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 201, " 'There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony.' "  "California law affords numerous examples of a trial court's authority, in ruling upon motions, to resolve evidentiary disputes without resorting to live testimony." (*Ibid.*)

A new trial motion based on newly discovered evidence is disfavored, and denial of such a motion will be affirmed unless the defendant has clearly shown "a manifest and unmistakable abuse of discretion."  (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1151; *People v. Delgado, supra*, 5 Cal.4th at p. 328.)  " 'A court abuses its discretion if it acts "in an arbitrary, capricious, or patently absurd manner" ' " or " 'when its ruling "falls outside the bounds of reason." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 399.)

Defendant contends the trial court abused its discretion in not allowing live testimony from Juan to determine his credibility.  According to defendant, the information presented by both sides was contradictory and thus live testimony was required.  We disagree.

The trial court did not abuse its discretion in deciding the new trial motion without Juan's live testimony.  The court considered Juan's initial statement, his subsequent statements, the circumstances surrounding his initial statement, and the effect the stroke had on his memory, and it determined it was "not going to help this Court in any way to have him testify."  The court explained it had sufficient information from the parties' written submissions to make a credibility determination, and we agree.  The court reasonably could decide whether Juan's initial statement—the basis for defendant's motion—was credible based on the record before it.  Defendant has not shown "a manifest and unmistakable abuse of discretion" in denying live testimony.  (*People v. Mehserle, supra*, 206 Cal.App.4th at p. 1151.)

The only authority defendant cites on this point is *People v. Hairgrove* (1971) 18 Cal.App.3d 606 (*Hairgrove*).  There, after the defendant was convicted of breaking into a car, a third party submitted a declaration admitting he was the one who broke into the car and the defendant was not there.  (*Id*. at pp. 608-609.)  At the hearing on the defendant's motion for new trial, the third party was in court and apparently willing to testify, but the trial court dissuaded him from doing so.  (*Id*. at p. 609.)  The court denied the new trial motion on the ground that the defendant had not been diligent in producing the third party at trial—prior to trial the defendant was aware the third party had committed the crime.  (*Id*. at p. 610.)  The appellate court remanded for the trial court to rehear the motion for new trial.  (*Id*. at p. 611.)  Under the circumstances, "the trial court should have taken affirmative action to call [the third party] as a witness and examine him under oath."  (*Id*. at p. 610.)  "We think it axiomatic that a court should make every effort to hear a witness who appears in court to confess to a crime for which someone else stands convicted."  (*Id*. at p. 611.)

17

*Hairgrove* does not assist defendant because the circumstances are vastly different. Here, the trial court was not confronted with a third party confessing to the crime. (*Hairgrove, supra*, 18 Cal.App.3d at p. 609.) And here, unlike in *Hairgrove*, Juan made subsequent statements which contradicted his typed statement. Further, the third party in *Hairgrove* signed a declaration under penalty of perjury and was in court and willing to testify at the hearing on the new trial motion. (*Id*. at p. 609.) Those are not the circumstances here.

In any event, even if the trial court erred by not taking Juan's live testimony, we find any error harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694 [in reviewing denial of a motion for new trial, we determine whether error was prejudicial].) If Juan had testified at the hearing on the new trial motion and his testimony repeated the facts contained in his initial statement, the court made clear it would not affect its ruling on the motion. It explained Juan's information merely constituted impeachment evidence which did not gravely undermine the prosecution witnesses' credibility. A " 'new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party." (*People v. Hall* (2010) 187 Cal.App.4th 282, 299.) Further, the trial court reasoned that additional evidence—text messages between the victim and defendant—corroborated the victim's testimony. Juan's information did not constitute new evidence and the court denied the motion for new trial.

Therefore, any alleged error in not allowing live testimony did not prejudice defendant because it did not affect the ruling on the motion for new trial.

# III.   DISPOSITION

The judgment is affirmed.

LANGHORNE WILSON, J.

WE CONCUR:

HUMES, P. J.

CASTRO, J.*

A167235

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20